IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHERYL M. SMITH,**

        **Plaintiff,**

  v.                              **Civil Action 2:20-cv-0095**
                                    **Judge James L. Graham**
                                    **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Cheryl M. Smith, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.     BACKGROUND**

Plaintiff filed her current application for DIB on December 3, 2014, alleging that she was disabled beginning September 14, 2004, due to degenerative disc disease, arthritis in her hips, radiculopathy, nerve damage from staph infection inside her spinal column, anxiety, depression, social anxiety and anger, and chronic pain[1]. (Tr. 176–77). After her application was denied initially and on reconsideration, the Administrative Law Judge ("ALJ") held a hearing on March 14, 2017. (Tr. 35–70). The ALJ denied benefits in a written decision on July 3, 2017. (Tr. 12–

---

[1] Plaintiff's previous application for benefits resulted in a fully favorable decision on September 2, 2009. (Tr. 100–07). Plaintiff's disability payments were subsequently ceased due to a continuing disability review determination. Plaintiff's period of disability terminated January 31, 2014, resulting in the earliest possible onset date of disability being February 1, 2014. (Tr. 191, 740).

31). That became the final decision of the Commissioner when the Appeals Council denied review. (Tr. 1–6).

On April 4, 2018, Plaintiff filed a case in this Court seeking a review of the final decision of the Commissioner. (Tr. 806–07). Upon a joint motion of the parties, the District Court remanded the case to the Commissioner. (Tr. 808–12). The Appeals Council issued a Remand Order on December 14, 2018 (Tr. 813–17), and a hearing was held on June 27, 2019 (Tr. 773– 805). On September 9, 2019, the ALJ issued a decision again denying Plaintiff's applications for benefits. (Tr. 736–72). Plaintiff did not request review by the Appeals Council opting to directly file suit with this Court, on January 6, 2020 (Doc. 1). The Commissioner filed the administrative record on March 23, 2020 (Doc. 6), and Plaintiff filed her Statement of Errors (Doc. 9) on June 5, 2020. This matter is now ripe for consideration. (*See* Docs. 9, 10, 11).

### A. Relevant Hearing Testimony

Because Plaintiff's Statement of Errors pertains to only her mental health, (*see generally* Doc. 9), the Undersigned will limit her discussion of the relevant hearing testimony and medical evidence to the same. The ALJ usefully summarized Plaintiff's initial 2017 hearing testimony:

> The [Plaintiff] testified she does not possess a driver's license. She initially testified she did not retake the driver's examination because she personally did not feel she could drive and during her second hearing, she reported her physician would not let her drive. While she does not drive, the record supports the [Plaintiff] was capable of arranging transportation to attend necessary appointments and seek medical treatment. Arranging transportation generally requires advanced planning and organization. The record supports during the period under adjudication the [Plaintiff] has lived with her family, including her father, two children, and husband, but now lives with her adult son (Testimony).
>
> At her initial hearing she reported seeing her friends on a monthly basis (Testimony). Further, she noted she was attending NA meetings three times per week (Testimony). [] She testified that she would walk to the mailbox and get her mail (Testimony). [] At the hearing, she noted she assists her children specifically with geometry (Testimony).

2

(Tr. 746).

> The [Plaintiff] testified during her initial hearing in 2017 that she lived with her husband and two children. She reported that she had a high school education and attended some college. The [Plaintiff] stated that she had a driver's license in the past, but did not have a license at that time, as it was suspended for DUI charges. The [Plaintiff] stated when she was permitted to get a license again, she just did not obtain one. She reported that she did not trust her feet to work the pedals.
>
> The [Plaintiff] stated that her husband works. She stated that she has a medical card. She reported that she last worked in 2004 before her back surgery. The [Plaintiff] stated she had a laminectomy surgery at L3-4 and subsequently experienced a staph injection. She stated she was in bed for a year. She reported after that she had close to a year of intense physical therapy to rebuild her muscle and endurance.
> []
>
> The [Plaintiff] reported that she takes medications for depression. She reported seeing a counselor once per week. The [Plaintiff] reported that at times she had to call her physician in the evenings on his cell phone when her appointments were more than one week apart. The [Plaintiff] reported that some of her medications are helpful, but she admitted she continued to have a hard time keeping her thoughts straight. The [Plaintiff] reported that she was weepy and did cry.
>
> The [Plaintiff] testified that she has been off narcotic medications since 2014. The [Plaintiff] admitted a history of substance abuse, including heroin. The [Plaintiff] reported she went to an inpatient treatment facility in December 2014 to detox from substances. The [Plaintiff] stated that she has used marijuana for her pain, but notes her pain has to be pretty rough for her to take that chance. The [Plaintiff] stated she was attending NA meetings three times per week, but noted she was not really comfortable leaving her home, because it makes her angry seeing people around her happy.
>
> The ALJ also summarized Plaintiff's 2019 hearing testimony:
>
> The [Plaintiff] testified during her 2019 hearing that she was 48 years old. She reported living at home with her 22-year-old son. She reported that she lost her husband during the Christmas of 2017. She reported that since that time she lost 85-90 pounds. The [Plaintiff] stated that she did regain 30 pounds after starting mental health medications, but reports she overall feels better.
>
> She reported having a driver's license, but stated her surgeon will not let her drive. She stated she loses control, her legs go numb, and driving is not safe for her.
>
> The [Plaintiff] reported she has a medical card, but does not receive food stamps. She reported that she and her son pull together. She reported that her son works and her brother also helps her. . . .

3

> The [Plaintiff] testified she has a hard time in social settings. She reported she got pulled over driving without a license in 2017 and was incarcerated for six months. The sentence was suspended until December 2018. The sentencing was delayed in order for the [Plaintiff] to obtain psychological treatment and medications. The [Plaintiff] reported she is involved in behavioral health treatment. She reported attending counseling every couple of months and noted that her medications are regulated. She reported seeing her counselor once per week. She stated that she does use marijuana and last used in April 2019. The [Plaintiff] reported that she is having some symptoms as she is having a hard time adjusting to life without her husband.

(Tr. 748–50).

### B. Relevant Medical Evidence

Analyzing Plaintiff's mental impairments, the ALJ summarized the relevant medical records:

> The [Plaintiff] reported history of depression and anxiety (Exhibit B7E). During May 2014, the [Plaintiff] reported anxiety, but it was notably asymptomatic with her current treatment, specifically with medication (Exhibit B3F/12). The treatment notes supported her anxiety was progressively improving (Exhibit B3F/12). The [Plaintiff] endorsed depression, but admitted she was doing better with Prozac medication and treatment notes supported she was showing progressive improvement (Exhibit B3F/12). The [Plaintiff] evidenced no obsessive thoughts, showed no delusions, and no suicidal ideation (Exhibit B3F/14). She was continued on Prozac and Xanax medication (Exhibit B3F/1). The [Plaintiff] was afforded a consultative examination in March 2015 (Exhibit B7F). The [Plaintiff] reported her arthritis and anxiety prevented her from holding a job (Exhibit B7F). The [Plaintiff] admitted she was mean, but had not required any psychological hospitalization (Exhibit B7F/2). She reported that she was treated for depression and saw a counselor in the past year (Exhibit [B]7F/3). She endorsed no suicidal ideation, no hallucinations, delusions, or dissociative experiences (Exhibit B7F/3). The [Plaintiff] was observed to be appropriately dressed, cooperative, and used normal speech (Exhibit B7F/3). She had no issues focusing and her associations were adequate without the presence of flight of ideas (Exhibit B7F/3). The [Plaintiff] showed no depression and maintained eye contact (Exhibit B7F/4). She reported worrying a lot, but remained able to go about within her community (Exhibit B7F/4). Her memory was intact and she was functioning in the average range of intelligence (Exhibit B7F/4). She noted she could leave her home and go within the community, engaging in activities such as shopping; however, she reported a preference to do [these] activities with another individual (Exhibit B7F/4). She was assessed as being able to manage her own funds (Exhibit B7F/6). During her physical examination, she demonstrated a pleasant affect and appropriate mood, being described as both alert and oriented (Exhibit B8F/4). She was observed to

4

have normal mentation and thought processes (Exhibit B8F/4). During June 2015, the [Plaintiff] demonstrated normal mood and affect, with the use of Prozac medication (Exhibit B13F/2, 3). In December 2015, the [Plaintiff] evidenced a bipolar disorder (Exhibit B16F/1). She wanted to regain control of her mental issues and started treatment (Exhibit B16F/5). She reported small triggers caused her to overreact (Exhibit B16F/5). During this time[,] it should be noted the [Plaintiff] complained about issues within her home, specifically noting that her father wanted her family to move out of his home (Exhibit B19F/11). She endorsed poor energy and a lack of motivation (Exhibit B16F/5). The [Plaintiff] was started on medication and instructed on medication compliance (Exhibit B16F/4). The [Plaintiff] was observed to be agitated, anxious, and depressed and showed limited attention and concentration, with loose tangential thoughts (Exhibit B16F/3). During this time[,] she exhibited drug seeking behaviors, specifically requesting certain medications (Exhibit B16F/3). The [Plaintiff]'s Abilify medication was increased (Exhibit B16F/2). With the increase in medication and cessation of Prozac, the [Plaintiff] reported improvement (Exhibit B16F/1). Her speech was less rapid and she was observed to be less distracted (Exhibit B16F/1). Her memory was intact and her mood was only a bit depressed with intact thought processes (Exhibit B16F/1).

Counseling notes from February 2016, support the [Plaintiff] was focused on her family situation (Exhibit [B]19F/10). She endorsed her son was out of control at the time (Exhibit B19F/8). She reported her husband was not helpful within the home and did nothing (Exhibit B19F/8). Further, at the time she admitted she was not in routine treatment with any specific primary care physician (Exhibit B19F/8). During April 2016, the [Plaintiff] reported anxiety when leaving her home and was tearful during her appointment (Exhibit B19F/6). However, her treatment provider assessed she was showing adequate progress with the treatment modalities (Exhibit B19F/6). During May 2016, the [Plaintiff] was notably less tearful and less stressed, reporting some pain and low energy (Exhibit B19F/4). However, she continued to demonstrate adequate progress through counseling (Exhibit B19F/4). During May 2016, the [Plaintiff] continued to show ongoing adequate progress (Exhibit B19F/3). The [Plaintiff] was taking medications and showed no psychosis (Exhibit B19F). During June 2016, the [Plaintiff] showed some increased symptomology when she reiterated that her father wanted her to move out of his home (Exhibit B19F/16). However, she reported that she was negotiating with him a way for her family to stay (Exhibit B19F/16). In November 2016, the [Plaintiff] was tearful, mean, and short (Exhibit B19F/14). However, by December 2016, she was again showing adequate progress (Exhibit B19F/20). Her treatment notes support a waxing and waning of her mental symptoms.

The [Plaintiff] in early January 2017 supported situational stressors, including finding alternative housing (Exhibit B19F/19). During February 2017, the [Plaintiff] reported ongoing sobriety despite suspicious her partner had relapsed (Exhibit B19F/18).

5

> It should be noted the record referenced a jail hold and subsequent mental inpatient treatment; however, this treatment did not occur until May 2019, months after the expiration of her date last insured and thus, such treatment notes are not relevant to the period under adjudication.

(Tr. 753–54).

### C. The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement on March 31, 2019 and did not engage in substantial gainful activity during the period from her alleged onset date of September 14, 2005, through her date last insured of March 31, 2019. (Tr. 743). The ALJ determined that, through the date last insured, Plaintiff suffered from the following severe mental impairments: depressive disorder; bipolar disorder; and generalized anxiety disorder. (*Id.*). The ALJ, however, found that, through the date last insured, none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 745).

As to Plaintiff's mental residual functional capacity ("RFC"), the ALJ opined:

> She would be limited to performing simple, routine, repetitive tasks without strict production rates or fast-paced work. The claimant could have no interaction with the public and only occasional interaction with coworkers.

(Tr. 747).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 750).

As for the opinion evidence, the ALJ first considered the opinion of Plaintiff's treating psychologist, Dr. Wolfgang, who opined, in a May 2016 letter, that Plaintiff would have difficulty working for even an hour when experiencing significant pain. (Tr. 760). The ALJ afforded this opinion "little weight," explaining, in part, that it was inconsistent with Plaintiff's mental health

6

records, as well as records pertaining to her pain. (Tr. 760–61). The ALJ also considered Dr. Wolfgang's mental health medical source statement, on which he noted various degrees of limitation in the areas of mental health functioning. (Tr. 761–62). The ALJ afforded the opinion "some weight," explaining, in part, that it was inconsistent with the mental health records showing that Plaintiff's mental health symptoms were generally well-controlled with conservative counseling with Dr. Wolfgang and her use of prescribed medications from other providers. (Tr. 761).

Finally, the ALJ concluded that, through her date last insured, Plaintiff was unable to perform her past relevant work as an assistant retail clerk or a billing clerk. (Tr. 763). Relying on the vocational expert's testimony, the ALJ found that, through her date last insured, Plaintiff could perform other jobs in the national economy such as a printed circuit board inspector, table worker or film touch up inspector. (Tr. 763–64). She therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act, at any time from her alleged onset date to her date last insured. (Tr. 764–65).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

In her sole assignment of error, Plaintiff argues that the ALJ improperly evaluated the opinions of her treating psychologist, Dr. Wolfgang. (Doc. 9 at 7–13).

Two related rules govern how the ALJ was required to analyze his opinions. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016).[2] The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)

---

[2] Effective for claims filed after March 27, 2017, the Social Security Administration's new regulations alter the treating physician rule in a number of ways. *See* 20 C.F.R. §§ 404.1527, 416.927 (2016).

8

(alterations in original)); *see also* 20 C.F.R. § 404.1527(c)(2); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that her physician has deemed her disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Id.* "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified upon the record.'" *Blakely* 581 F.3d 399 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d at 243 (alterations in original)). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Plaintiff asserts that the ALJ failed at both steps. Specifically, she asserts that the ALJ failed to apply the required controlling weight analysis at the first step and then failed to set forth good reasons for discounting Dr. Wolfgang's opinion. (*See generally* Docs. 9, 11). Dr. Wolfgang

9

issued two opinions in this case—a May 2016 letter to Plaintiff's counsel (Tr. 383–84) and a mental health medical source statement form (Tr. 385–87). For both, Plaintiff contends that the ALJ failed to explicitly apply the controlling weight analysis under the first step. (*See generally* Doc. 9 at 8–10; Doc. 11). But an ALJ's failure to note expressly the controlling weight analysis is not, by itself, grounds for reversal. Instead, remand is warranted where the ALJ failed to apply the controlling weight analysis, and it is unclear why the ALJ assigned less than controlling weight to the opinion. *See Friend*, 375 F. App'x at 551 (noting that the treating physician rule "is not a procrustean bed, requiring an arbitrary conformity at all times" and that "[i]f the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused"); *see also Cunningham v. Colvin*, No. 1:13-CV-2487, 2014 WL 7238536, at *11 (N.D. Ohio Dec. 17, 2014) (rejecting plaintiff's "technical violation of the requirement" and noting that "this is not a case in which the claimant is unable to ascertain the Commissioner's reasons for assigning less than controlling weight to the opinion of his treating physician"); *Madej v. Colvin*, No. 1:12-CV-2663, 2013 WL 1874851, at *9 (N.D. Ohio May 3, 2013) ("Although the ALJ did not explicitly acknowledge either that Dr. Matthew had treated Plaintiff since January 2009 or that Dr. Matthew was a psychiatrist, he did offer good reasons to support his decision to assign little weight to Dr. Matthews' opinion.").

Here, the ALJ provided good reasons for discounting the opinions of Plaintiff's treating psychologist. So remand is not warranted here.

### A. Dr. Wolfgang's Letter

To begin, the ALJ properly assessed Dr. Wolfgang's May 2016 letter to Plaintiff's attorney. In his letter, Dr. Wolfgang provided a history of Plaintiff's physical conditions and substance use,

10

noting that he relied on her subjective reports regarding her physical and substance abuse histories. (Tr. 383). He also acknowledged that he did not have the ability to verify her reports. (*Id.*). Dr. Wolfgang opined that, when experiencing significant pain, Plaintiff would have difficulty working for even one hour, much less an entire shift. (Tr. 384). He also opined that, on days when her pain is less severe, she shows pain behavior and lowered energy and, therefore, it would be questionable if she could endure work-related behaviors for more than a half-day. (*Id.*).

Contrary to Plaintiff's argument, (*see* Doc. 11 at 4–5), the ALJ properly considered whether Dr. Wolfgang's opinion is well supported and consistent with the other substantial evidence in the record. She also provided good reasons for affording it "little weight." Specifically, she noted that, "[w]hile Dr. Wolfgang reported her mental condition[s] interacted with one another, he did not report how the impact of treating her pain would affect her mental symptomology." (Tr. 760). Further, the ALJ noted that Dr. Wolfgang's opinion pertaining to Plaintiff's mental health issues related to pain were "inconsistent with provided physical evidence." (*Id.*). The ALJ explained, "[d]espite [Plaintiff's] reports of pain, during 2016, the claimant showed 5/5 strength in the upper and lower extremities" and "[h]er reflexes were normal, she had negative straight leg testing, intact sensation, [] full range of motion in the hips," and "did not require the use of assistive device or ambulatory aid." (*Id.*). And the ALJ compared Dr. Wolfgang's own treatment notes with the opinions in his letter. Specifically, treatment notes showed that, with medication, Plaintiff was less tearful, less stressed, and experienced adequate progress in counseling sessions. (Tr. 761).

Moreover, Plaintiff "did not require emergent treatment for acute symptom exacerbation during this time, nor did [she] require inpatient treatment related to mental instability." (*Id.*). Finally, the ALJ noted that, at the time he wrote the letter, "Dr. Wolfgang had seen the claimant

11

for only eight sessions, beginning in December 2015," and therefore, "had not established a longitudinal treatment relationship with claimant, admitting he saw the claimant only eight times over the span of six months." (Tr. 760). Despite Plaintiff's argument, this, too, was a proper consideration. *See* 20 C.F.R. § 404.1527(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

The Undersigned finds that the ALJ properly considered the opinions from Dr. Wolfgang's letter and clearly articulated good reasons for discounting it. *See Rogers*, 486 F.3d at 242 (holding that reasons must be sufficiently clear to a reviewing court as to the basis for the weight assigned). Plaintiff has shown no reversible error with regard to this opinion.

### B. Dr. Wolfgang's Medical Source Statement Form

The same is true of the ALJ's consideration of Dr. Wolfgang's checkbox form. On the form, Dr. Wolfgang cited various degrees of limitation from no limitation to extreme limitation for the activities pertaining to mental health functioning. (*See generally* Tr. 385–87). He also opined that Plaintiff would do better if she had a job that did not require interaction with others, and that if she were placed under the stress of work, her condition would likely deteriorate, noting that the last time she worked, she was addicted to opiates. (*See id.*).

The ALJ completed a thorough analysis of this opinion and subjected each specific finding to proper scrutiny. To start, despite Plaintiff's contention otherwise (*see* Doc. 11 at 4–5), the ALJ properly considered whether the form is well-supported and consistent with other substantial evidence in the record. She also provided good reasons with regard to each opinion. Specifically, the ALJ afforded "some weight" to the varying degree of limitations checked on the form, explaining that "the record does support breakthrough mental health symptoms despite

12

medications and counseling" but "the record supports [Plaintiff's] medications were adjusted and she continued receiving conservative care." (Tr. 761). And the ALJ noted that the "[t]he record does not support [Plaintiff] required emergent treatment on a routine basis for acute symptom exacerbation nor does the record support any recurrent inpatient hospitalizations of extended duration during the period under adjudication." (Tr. 761–62).

Next, the ALJ gave "little weight" to Dr. Wolfgang's specific opinion that Plaintiff's condition existed since February 1, 2014, as Dr. Wolfgang "notably did not start treating the claimant until December 2015, well over a year after this alleged onset date" and further noting that "this date was typed and prefilled in on the form by the forms author and was not a date the claimant could insert himself." (Tr. 761). Additionally, the ALJ afforded "less weight" to Dr. Wolfgang's opinion that Plaintiff would experience decompensation if placed under stress at work. (*Id.*). The ALJ explained, "[t]he reasoning provided by the physician was that the claimant had previously increased her prescription drug use when working," but "the claimant at that time was addicted to drugs" and "[t]here is no objective evidence that the stress from her work caused her to use more drugs." (*Id.*). "Rather, at that time, [Plaintiff] admitted she eventually used heroin because her addiction intensified" and "[t]he record supports that after [she] went through detoxification in 2014, she did not require emergent treatment for acute mental health symptom exacerbation on require inpatient hospitalization for mental instability during the period under adjudication." (*Id.*). Further, the ALJ noted that "[t]he record supports the claimant's mental symptoms were generally well controlled with her conservative counseling with Dr. Wolfgang and her use of prescribed mental medications from other providers." (*Id.*). Accordingly, the ALJ concluded Dr. Wolfgang's "suggestion that [Plaintiff] would decompensate is not based on the objective evidence of record and therefore given less weight." (*Id.*).

13

Next, the ALJ afforded "some weight" to Dr. Wolfgang's opinion that Plaintiff would do better in a position that did not require interaction with others. (*Id*.). The ALJ explained, "[t]he record does support breakthrough mental symptoms of anger, irritability, tearfulness, and worry" and Plaintiff "testified she had some social anxiety." (*Id*.). The ALJ concluded that "the record supports mental symptoms that would support limiting interaction with others" but "does not objectively support a total isolation from interaction with others." (*Id*.). The ALJ noted "[f]or example, [Plaintiff] remained able to cohabitate with others" and, during the relevant period, "she reported having friends and was able to interact with them." (*Id*.). Plaintiff also "attended NA meetings multiple times a week"; "was able to leave her home to walk in her neighborhood and to get her mail"; and "was able to attend her treatment sessions." (*Id*.). Further, the ALJ noted "the record supported no issues interacting with medical providers or medical staff" and "she was observed to interact appropriately during her hearings." (*Id*.).

The Undersigned concludes that the ALJ's detailed analysis of each portion of the ALJ's form satisfies the good reasons requirement. *See Rogers*, 486 F.3d at 242 (holding that reasons must be sufficiently clear to a reviewing court as to the basis for the weight assigned); *see also Crofutt v. Comm'r of Soc. Sec.*, No. 2:13-CV-706, 2015 WL 964113, at *13 (S.D. Ohio Mar. 4, 2015) ("[T]he Undersigned concludes that while the ALJ did not explicitly acknowledge Dr. Newman as a treating physician, he did properly consider Dr. Newman's opinions and provide 'good reasons' for not assigning them controlling weight"); *Stetz v. Colvin*, No. 1:13-CV-00116, 2013 WL 4523512, at *12 (N.D. Ohio Aug. 26, 2013) ("Although the ALJ did not explicitly acknowledge that Mr. Muttillo was one of Plaintiff's treating sources, he offered good reasons to support his decision to assign less than controlling weight to Mr. Muttillo's opinion. . . . Plaintiff

14

does not explain how the ALJ's decision deprives him of the ability to understand the ALJ's reasons for finding the opinion of a treating source to be les than controlling.").

Plaintiff's argument that the ALJ does not explicitly cite purportedly inconsistent records when discussing Dr. Wolfgang's opinions is unpersuasive. (*See generally* Docs. 9, 11). Plaintiff contends that instead of explicitly referring to portions of the record purportedly inconsistent with Dr. Wolfgang's opinion, the ALJ used Plaintiff's "conservative" treatment record "as a catchall to provide some minimal explanation as to why less than controlling weight was being afforded to a majority of the opinions identified by Dr. Wolfgang." (Doc. 9 at 11). The Undersigned disagrees. When considering the mental health evidence earlier in her decision, the ALJ discussed records showing Plaintiff's improvement from conservative treatment. (*See, e.g.*, Tr. 753–54 (citing Tr. 402–03) (noting that, "[d]uring June 2015, [Plaintiff] demonstrated normal mood and affect, with the use of Prozac medication"); Tr. 754 (citing Tr. 466) (noting that, "[w]ith the increase in medication and cessation of Prozac, [Plaintiff] reported improvement[,] [h]er speech was less rapid and she was observed to be less distracted[,] [h]er memory was intact and her mood was only a bit depressed with intact thought processes"); *id*. (citing Tr. 676–78) (noting that, "[d]uring May 2016, [Plaintiff] was notably less tearful and less stressed, reporting some pain and low energy" but "she continued to demonstrate adequate progress through counseling," for example," "[d]uring May 2016, [Plaintiff] continued to show ongoing adequate progress[,] . . . was taking medications and showed no psychosis")).

These are just a few examples. And based on her review of the relevant mental health evidence, the ALJ explained:

> The relevant mental health treatment note[s] support during the period under adjudication the claimant received benefit from conservative treatment, including counseling and mental health medications. The record supported no recurrent emergent treatment for acute mental health symptom exacerbation nor did the

15

> claimant require inpatient hospitalization of extended duration of periods of mental instability. While the claimant faced some situational stressors, she remained able to live with her family and could care for her personal needs independently. She managed her own medical care and finances. The record supports she sought treatment when necessary and was able to leave her home to engage in routine activities such as occasionally attending church, attending NA meetings, and going shopping. She reported a preference to engage in activities outside the home with someone else; however, there was no objective evidence supporting the claimant could not perform such activities independently.

(Tr. 754–55).

So as she explained at length, the ALJ found that the above-described mental health evidence of record conflicted with Dr. Wolfgang's opinions. Her thorough opinion demonstrates as much. *See, e.g.*, *Pacheco v. Comm'r of Soc. Sec.*, No. 2:19-CV-3083, 2020 WL 913616, at *8 (S.D. Ohio Feb. 26, 2020) (reading the ALJ's decision as a whole and noting that the ALJ explained at length the clinical evidence with which he found the source opinions to be inconsistent); *Hughes v. Comm'r of Soc. Sec.*, No. 18-11168, 2019 WL 2950080, at *2 (E.D. Mich. July 9, 2019) ("[I]t is proper for the Court to read the ALJ's assessment of the treating physician's opinion together with the ALJ's decision as a whole").

At bottom, "[b]ecause the ALJ's reasons 'permit[] . . . a clear understanding of the reasons for the weight given' to [Dr. Wolfgang's] opinion, the ALJ's decision satisfies the purposes of the treating physician rule, and thus, provides no basis for remand in this case." *Stetz*, 2013 WL 4523512, at *12 (quoting *Friend*, 375 F. App'x at 551).

### IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific

proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   August 13, 2020                                /s/ Kimberly A. Jolson
                                                       KIMBERLY A. JOLSON
                                                       UNITED STATES MAGISTRATE JUDGE